**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHEW KING TAN, Individually and on Behalf of All Others Similarly Situated,<br><br><br>      Plaintiff,<br>  v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br><br>     Defendants. | Case No.: 1:21-cv-08413-PAC |
| TRAVIS FLORIO, Individually and on Behalf of All Others Similarly Situated,<br><br><br>      Plaintiff,<br>  v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br><br>     Defendants. | Case No.: 1:21-cv-08618-PAC |

MICHAEL MERSON, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,

Defendants.

Case No.: 1:21-cv-08752-PAC

MARK ULANCH, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,

Defendants.

Case No.: 1:21-cv-08897-PAC

ALMA FELIX, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,

Defendants.

Case No.: 1:21-cv-10286-PAC

| | |
|---|---|
| ALISON SCULLY, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No.: 1:21-cv-10791-PAC |
| v. | |
| GOLDMAN SACHS GROUP INC. and MORGAN STANLEY, | |
| Defendants. | |
| KEVIN LEE, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No.: 1:22-cv-00169-PAC |
| v. | |
| GOLDMAN SACHS GROUP INC. and MORGAN STANLEY, | |
| Defendants. | |

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS
THE AMENDED CLASS ACTION COMPLAINTS**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND ........................................................................................4

    A.  Archegos Engaged in Credit Transactions with Defendants and
        Other Counterparties ............................................................................4

    B.  In March 2021, After Its Positions Fall in Value, Archegos Defaults and Defendants
        Exercise their Contractual Remedies ....................................................6

    C.  Aftermath of Archegos's Collapse ........................................................7

ARGUMENT .............................................................................................9

I.     PLAINTIFFS FAIL TO PLEAD INSIDER TRADING BECAUSE THEY
       DO NOT ALLEGE ANY MISAPPROPRIATION BY DEFENDANTS ..............9

    A.  The Complaints Do Not Allege That Defendants Traded in
        Violation of Any Duty to Archegos ......................................................10

    B.  The Complaints Do Not Allege That Defendants Are Liable as
        Archegos's Tippees ............................................................................16

II.    THE SECTION 10(b) CLAIMS FAIL BECAUSE PLAINTIFFS DO NOT
       ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER ...18

III.   PLAINTIFFS' SECTION 10(b) CLAIMS FAIL BECAUSE PLAINTIFFS
       DO NOT ALLEGE LOSS CAUSATION .................................................21

IV.   THE SECTION 20A AND 20(a) CLAIMS FAIL FOR LACK OF A
       PRIMARY VIOLATION AND ADDITIONAL REASONS ...............................22

    A.  The Section 20A Claims in *Felix* and *Scully* Must Be Dismissed
        Because Lead Plaintiffs Do Not Allege Contemporaneous Trading ..................23

    B.  The Section 20(a) Claims Fail Because Plaintiffs Do Not Allege
        That Defendants Exercised Control Over Any Relevant Actor ............................24

CONCLUSION ..........................................................................................24

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*In re Aceto Corp. Sec. Litig.*,
2021 WL 4350501 (E.D.N.Y. Mar. 16, 2021) ..............................................................23

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................................................24

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) ......................................................................................22

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ......................................................................................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................................4

*Cambridge Cap. LLC v. Ruby Has LLC*,
565 F. Supp. 3d 420 (S.D.N.Y. 2021) ........................................................................13

*Capasso v. Cigna Ins. Co.*,
765 F. Supp. 839 (S.D.N.Y. 1991) ............................................................................17

*Chiarella v. United States*,
445 U.S. 222 (1980) .........................................................................................9, 10, 15

*Chill v. Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996) ......................................................................................21

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
565 F. Supp. 3d 478 (S.D.N.Y. 2021) ........................................................................22

*de Kwiatkowski v. Bear, Stearns & Co.*,
306 F.3d 1293 (2d Cir. 2002) ....................................................................................14

*Dirks v. SEC*,
463 U.S. 646 (1983) ........................................................................................ *passim*

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ..................................................................................................21

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ..................................................................................................18

*Fezzani v. Bear, Stearns & Co.*,
    592 F. Supp. 2d 410 (S.D.N.Y. 2008) .........................................................20

*Gamm v. Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019) ...............................................................9, 13

*Gordon v. Sonar Capital Mgmt. LLC*,
    962 F. Supp. 2d 525 (S.D.N.Y. 2013) ..................................................9, 19

*Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.* ,
    157 F.3d 933 (2d Cir. 1998) ..................................................................12

*Intellivision v. Microsoft Corp.*,
    784 F. Supp. 2d 356 (S.D.N.Y. 2011) ......................................................12

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*,
    32 F.3d 697 (2d Cir. 1994) ..................................................................22

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ............................................................21, 22

*N.Y. Indep. Contrs. All., Inc. v. Consol. Edison Co. of N.Y. Inc.*,
    2017 WL 773600 (S.D.N.Y. Feb. 27, 2017) .............................................14

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................13

*O'Connor & Assoc. v. Dean Witter Reynolds, Inc.*,
    559 F. Supp. 800 (S.D.N.Y. 1983) .........................................................23

*Press v. Chem. Inv. Servs. Corp.*,
    166 F.3d 529 (2d Cir. 1999) ................................................................12

*Ross v. Bolton*,
    639 F. Supp. 323 (S.D.N.Y. 1986) .........................................................20

*Salman v. United States*,
    580 U.S. 39 (2016) ..............................................................................9

*In re Satyam Comp. Servs. Ltd. Sec. Litig.*,
    915 F. Supp. 2d. 450 (S.D.N.Y. 2013) ....................................................20

*SEC v. Obus*,
    693 F.3d 276 (2d Cir. 2012) ................................................................19

*SEC v. One Or More Unknown Traders in the Secs. of Onyx Pharms., Inc.*,
    296 F.R.D. 241 (S.D.N.Y. 2013) ...................................................................16

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 3d 247 (S.D.N.Y. 2008) .......................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................................18

*United States v. Chestman*,
    947 F.2d 551 (2d Cir. 1991) (en banc) ...............................................*passim*

*United States v. Litvak*,
    889 F.3d 56 (2d Cir. 2018) ...................................................................... 12

*United States v. Martoma*,
    894 F.3d 64 (2d Cir. 2017) ...................................................................... 10

*United States v. O'Hagan*,
    521 U.S. 642 (1997) .........................................................................9, 11, 16

*Vent v. MARS Snackfood US, LLC*,
    350 F. App'x 533 (2d Cir. 2009) ..............................................................10

*Walton v. Morgan Stanley & Co.*,
    623 F.2d 796 (2d Cir. 1980) .....................................................................14

*Warren v. John Wiley & Sons, Inc.*,
    952 F. Supp. 2d 610 (S.D.N.Y. 2013) .....................................................13

*W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*,
    344 F. App'x 717 (2d Cir. 2009)...............................................................20

*XY Planning Network LLC v. U.S. S.E.C.*,
    963 F.3d 244 (2d Cir. 2010) .....................................................................12

### STATUTES & RULES

15 U.S.C. § 78j(b) ...................................................................................10

15 U.S.C. § 78u-4(b)(1) .......................................................................9, 13

Fed. R. Civ. P. 8(a) ...............................................................................13

Fed. R. Civ. P. 9(b) ...........................................................................9, 13

Defendants Goldman Sachs Group, Inc. ("Goldman Sachs") and Morgan Stanley (together, "defendants") respectfully submit this memorandum of law in support of their motions to dismiss the amended complaints in these coordinated actions (the "complaints").[1]

### PRELIMINARY STATEMENT

In late March 2021, Archegos Capital Management, LLC ("Archegos") defaulted on its contractual obligations to post margin to several of its trading counterparties and margin lenders. In response, some of these counterparties, including defendants Morgan Stanley and Goldman Sachs, exercised their contractual remedies by closing out their swap trades with Archegos and unwinding their associated hedges, and, in some instances, selling the securities they held as collateral for their margin loans.  The failure of Archegos garnered significant interest and prompted several governmental investigations, resulting in criminal and civil complaints against Archegos and its key managers, some of whom have pled guilty to criminal charges.  The complaints detail the public record of these events at length, but Archegos's alleged misdeeds have almost nothing to do with plaintiffs' claims in this lawsuit.

Plaintiffs allegedly bought shares of stock in the same companies whose shares the defendants sold when they closed out their swaps and margin accounts with Archegos.  Plaintiffs try to turn defendants' exercise of their contractual remedies into a claim for "insider trading" under Sections 10(b) and 20A of the Securities Exchange Act of 1934, because defendants allegedly knew, when they sold, that Archegos was about to collapse and that a broader sell-off

---

[1] On March 10, 2022, this Court coordinated the following actions: *Tan v. Goldman Sachs Group, Inc.*, No. 1:21-cv-08413; *Florio v. Goldman Sachs Group, Inc.*, No. 1:21-cv-08618; *Merson v. Goldman Sachs Group, Inc.*, No. 1:21-cv-08752; *Ulanch v. Goldman Sachs Group, Inc.*, No. 1:21-cv-08897; *Felix v. Goldman Sachs Group, Inc.*, No. 1:21-cv-10286; *Scully v. Goldman Sachs Group, Inc.*, No. 1:21-cv-10791; *Lee v. Goldman Sachs Group, Inc.*, No. 1:22-cv-00169.  *See, e.g.*, Mem. & Order, No. 1:21-cv-08413, ECF 42.  On June 13, 2022, lead plaintiffs filed seven substantively identical amended complaints.

of these stocks was imminent.  Plaintiffs assert that defendants should be held liable in fraud for the losses plaintiffs allegedly incurred when the prices of these shares fell.

Plaintiffs' novel insider trading claims fail as a matter of law.  The complaints do not plead facts supporting the fundamental requirement that defendants misappropriated information or traded in violation of a duty.  Instead, the complaints demonstrate that defendants simply exercised their contractual remedies to terminate their transactions with Archegos and sell the associated securities positions after Archegos defaulted on its obligations.  No facts are alleged that, even if true, would establish that either defendant misappropriated any information from Archegos or anyone else.  Financial services firms like Morgan Stanley and Goldman Sachs have no general fiduciary duties to swap counterparties and margin traders like Archegos.  Nor are any facts alleged to show that defendants assumed such a duty.  To the contrary, the complaints make clear that no one, including Archegos, believed that defendants owed a duty to Archegos not to sell the shares they held.  Even if, as plaintiffs allege, defendants knew that Archegos was failing and the shares they sold would fall in value, that allegation does not establish insider trading by defendants.  The complaint fails to allege any facts that would make such trading unlawful, because defendants owed no duty to Archegos—or anyone else—not to sell stock following Archegos's default.

Plaintiffs' alternative insider trading theory—that defendants were somehow "tippees" of Archegos—also fails as a matter of law.  A "tippee" is liable for trading on information knowing that the tipper has misappropriated it from the information's source.  But Archegos is not alleged to have misappropriated any information from anyone.  Rather, plaintiffs allege that Archegos informed defendants about its *own* trading positions.  It never received "inside" information from the issuers of the stock that defendants sold or anyone else.  There was no wrongful "tip" by

Archegos.  It follows that defendants cannot be liable as "tippees."

Plaintiffs' claims fail for additional reasons.  The complaints' allegations do not support a strong inference that defendants acted with scienter, which is fatal to the Section 10(b) claims. Plaintiffs' lengthy descriptions of the allegations made against Archegos by the U.S. Department of Justice and other agencies in no way support an inference of scienter on the part of *defendants*. Archegos had misled *them* about its positions and the risks those positions posed, as plaintiffs acknowledge.  When defendants allegedly learned, on March 25, 2021, about Archegos's concentrated exposures and impending default, defendants responded in keeping with the terms of their agreements with Archegos:  they sold securities that had been pledged, terminated their swap trades and unwound their hedges—*i.e.*, precisely what swap counterparties and margin lenders ordinarily do when a counterparty defaults.  No facts are alleged to suggest that either Morgan Stanley or Goldman Sachs sought to defraud anyone.  Similarly irrelevant are the assertions about defendants' supposed sales practices regarding "block trades."  Plaintiffs do not even try to link these allegations to the stock sales by defendants on which they base their claims. The Section 10(b) claims also must be dismissed for failure to plead loss causation, because the complaints do not allege that defendants' conduct caused plaintiffs' purported trading losses. Plaintiffs assert that unspecified "information" purportedly withheld by defendants later became known to the markets, but the complaints fail to explain what that information was or how or when it became known, much less how it caused plaintiffs any loss.

Plaintiffs' failure to plead insider trading in violation of Section 10(b) similarly dooms their insider trading claim under Section 20A and their control person claim under Section 20(a), both of which require an underlying Exchange Act violation.  The Section 20A claims also fail as to lead plaintiffs in the *Felix* and *Scully* actions, because they do not plead the essential

element of having traded contemporaneously with defendants; according to their complaints, these lead plaintiffs purchased *before* defendants began to sell.  Nor do the complaints allege actual control by either defendant, precluding liability under Section 20(a).

For all these reasons and those below, the complaints in each of the coordinated actions should be dismissed in their entirety.

## BACKGROUND

Lead plaintiffs each allege that they purchased shares in one of seven different companies between March 22 and March 29, 2021 (the "Class Period") and suffered losses when the prices of those shares later declined.  (¶¶ 2, 15, 22, 206.)[2]  Plaintiffs assert that Goldman Sachs and Morgan Stanley sold shares in these companies after learning from Archegos on March 25, 2021 that it would default on its obligations to them and had much larger market exposures to these stocks than it had previously disclosed to them.  (*E.g.*, ¶¶ 7-8.)

### A.   Archegos Engaged in Credit Transactions with Defendants and Other Counterparties

Archegos allegedly is the "family office" of trader Sung Kook (Bill) Hwang and, as of March 2021, managed over $36 billion.  (¶¶ 25-28.)  As part of its investment activities, Archegos dealt with several counterparties, including Goldman Sachs and Morgan Stanley. (¶¶ 36, 106-07.)  The complaints allege that Archegos's dealings with these counterparties included, among other things, borrowing on margin and derivative trades commonly known as total return swaps.  (¶¶ 2, 23-24, 45.)

---

[2] The seven companies are Gaotu Techedu Inc., Vipshop Holdings Ltd., Tencent Music Entertainment Group, ViacomCBS Inc., IQIYI Inc., Baidu Inc. and Discovery Inc.  (¶ 2.)  Paragraph citations are to the amended complaint in *Tan*, No. 1:21-cv-08413, ECF 54, but each complaint makes the same core allegations about defendants.  The complaints' factual allegations are assumed to be true solely for purposes of this motion.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Margin lenders extend credit in exchange for pledges of marketable securities or cash held in the borrower's account.  (¶¶ 45, 52-53.)  According to plaintiffs, Archegos's margin lenders could require Archegos to contribute additional capital if the value of its assets that secured those borrowings declined.  Such demands are known as "margin calls."  (¶¶ 52-55, 107.)  Failure to satisfy a margin call may constitute an event of default and entitle the lender to sell the securities pledged as collateral for the loan.  (*See* ¶¶ 53, 206.)

Archegos allegedly also entered into total return swaps with various counterparties, including Goldman Sachs and Morgan Stanley.  (¶¶ 2, 108.)  A swap is a derivative contract that enables a party (here, Archegos) to gain synthetic long exposure to a company's stock without actually buying it.  (¶¶ 56-58, 107.)  The parties to the swap agree that if the price of the referenced security goes up, the long party has a claim on its counterparty for the increase in value; if the price falls, the long party must pay its counterparty to make up for the decline.  (¶¶ 56-58.)  A party to a swap that owes funds may be required to collateralize its obligation in cash or other assets, also known as "margin."  (¶¶ 3, 58, 173.)  A failure to post margin may constitute a default and entitle the counterparty to terminate the swap.  (¶¶ 56-58, 107-08, 206.)  Plaintiffs allege that, in keeping with industry standards, defendants hedged their swaps with Archegos by purchasing the referenced stock, so as to be "risk neutral"—*i.e.*, the amount they would owe Archegos if the price rose would be covered by the increased value of the stock that they held.  (¶¶ 110-11.)

Each defendant knew of the positions that Archegos held with them individually (¶ 153), but as plaintiffs acknowledge, defendants "may not have known the exact amount of Archegos's aggregate exposure."  (¶ 185.)  Plaintiffs do not allege that defendants had specific information about Archegos's investment holdings across the numerous counterparties with which it dealt.

**B.      In March 2021, After Its Positions Fall in Value, Archegos Defaults
          and Defendants Exercise their Contractual Remedies**

As of March 2021, Archegos allegedly had acquired "heavily concentrated" exposures to

the stock prices of a small number of companies.  (¶¶ 116, 122.)  Early in the week of March 22,

2021, the price of some of the stocks fell sharply.  Archegos's positions declined by billions of

dollars, which prompted margin calls from its various counterparties to cover the losses.

(¶¶ 131-32, 186-87, 190-91, 193, 196.)  Archegos at first managed to post additional collateral,

but on March 24, following additional stock price declines, it allegedly advised each defendant

that it could not satisfy additional margin calls expected on March 25.  (¶¶ 195-97.)

Plaintiffs allege that, on March 25, 2021, Archegos's position "further deteriorated," and

"at least one Counterparty issued a notice of default, another issued a notice to Archegos

exercising its early termination rights and three Counterparties issued margin failure notices."

(¶ 198-99.)  To obtain additional liquidity, also on March 25, Archegos allegedly "reached out to

Defendant Goldman Sachs to execute a block trade."  (¶ 200.)  Late on the same day, with

Archegos's consent to "shop around its stock," Morgan Stanley allegedly sold about $5 billion of

its investments, at a discount, in block trades "to a small group of hedge funds."  (¶ 204.)

On the same night, March 25, Archegos allegedly organized a group call with defendants

and certain other counterparties "in an attempt to thwart a large scale liquidation that might

exacerbate stock price declines."  (¶¶ 199-201.)  According to the complaints, during that call

Archegos revealed to these counterparties that its gross exposure exceeded its capital by billions

of dollars.  (¶ 200.)  Archegos allegedly asked defendants and its other counterparties to "agree

not to declare Archegos in default while the latter wound down its positions."  (¶ 201.)  These

discussions on March 25, and subsequent similar attempts, "proved fruitless" because Goldman

Sachs, Morgan Stanley and at least one other counterparty "were not interested in participating in

a managed liquidation of Archegos."  (¶ 203.)

On the following day, Friday, March 26, Archegos's key margin lenders and swap counterparties "issued default notices and/or exercised early termination rights."  (¶ 206.) Goldman Sachs and Morgan Stanley each allegedly declared Archegos in default.  They "began unwinding Archegos's swaps" after Archegos "had failed to timely reduce [its] positions, generate sufficient cash or meet outstanding margin calls."  (*Id.*)  The complaints allege that, upon terminating the swaps, Goldman Sachs and Morgan Stanley sold the shares they had purchased to hedge their potential exposures under the swaps.  (*Id.*)

According to plaintiffs, the parties' discussions about "the possibility of a managed liquidation" of Archegos "persisted through March 26, 2021, and well into the weekend." (¶ 202.)  Plaintiffs allege that, in those discussions, internal counsel for defendants and the other counterparties "read a script" making clear that they "were not permitted to disclose their respective Archegos related position."  (*Id.*)  This is the only specific restriction purportedly agreed to during those alleged conversations.

### C.    Aftermath of Archegos's Collapse

In 2022, the U.S. Department of Justice indicted Hwang and other Archegos executives, some of whom have pleaded guilty (¶¶ 4, 11-12, 37, 39, 266), and the U.S. Securities and Exchange Commission and U.S. Commodity Futures Trading Commission filed civil complaints against Archegos, Hwang and others (¶¶  13, 40, 275).  The indictment and complaints in these proceedings—which plaintiffs' complaints reference and cite extensively (*see, e.g.*, ¶¶ 266-80)— allege that Archegos engaged in a manipulative scheme to dominate trading in the issuers' stocks.  (¶¶ 13, 274, 277.)  They allege that Archegos used swaps to avoid reporting its share ownership under Section 13 of the Securities Exchange Act of 1934 (the "Exchange Act"), and that it timed large intraday trades to manipulate share prices, including for purposes of its margin

obligations to defendants and other counterparties.  (¶¶ 12, 137, 141, 268-80.)

Plaintiffs do not, and cannot, allege that defendants knew about Archegos's purported attempt to manipulate the market when they entered into their swap arrangements with Archegos, or that they were aware of Archegos's allegedly improper trading practices.  To the contrary, plaintiffs allege that, in the periods leading up to March 2021, Archegos repeatedly gave its counterparties, including defendants, false or incomplete information and took steps to mislead them.  (*See, e.g.*, ¶¶ 158, 174(a), 178-79, 182-84, 195; *see also* ¶ 275 (noting CFTC assertion that Archegos "defrauded swap counterparties").)  The governmental proceedings relied on by the complaints similarly allege that Archegos "systematically misled the Counterparties in order to obtain additional trading capacity and margin lending to further support Archegos's inflated positions."  Indictment ¶ 47, *United States v. Hwang*, No. 1:22-cr-00240-AKH (S.D.N.Y. Apr. 25, 2022), ECF 1; *see also* Complaint ¶ 94, *SEC v. Hwang*, No. 1:22-cv-03402 (S.D.N.Y. Apr. 27, 2022), ECF 1 (alleging that Archegos "gave materially false information to Counterparties, or omitted material information, regarding the concentration and liquidity of its portfolio").

Plaintiffs also allege that the government is investigating the block trading practices of several financial services firms, including Morgan Stanley and Goldman Sachs.  (¶¶ 10, 42, 66.)  Citing media reports, plaintiffs allege that Morgan Stanley may at times have disclosed upcoming block sales to favored hedge fund clients, including in relation to a potential block trade by Archegos in 2020.  (¶¶ 70-84, 87-88.)  None of these allegations has any bearing on defendants' alleged actions during the week of March 22, 2021 that are the basis for plaintiffs' insider trading claims, and plaintiffs make no attempt to connect these allegations to their claims.

**ARGUMENT**

The complaints should be dismissed because they do not plead a claim of insider trading by defendants.  Plaintiffs fail to support at least three critical elements of their claims under Section 10(b) and Rule 10b-5:  (1) undisclosed trading in violation of a duty to disclose; (2) scienter; and (3) loss causation.  *See, e.g.*, *Gordon v. Sonar Cap. Mgmt. LLC*, 962 F. Supp. 2d 525, 525 (S.D.N.Y. 2013).  Under the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b), plaintiffs are required to plead the alleged deceptive conduct with particularity, including "all facts" supporting allegations made on information and belief, 15 U.S.C. § 78u-4(b)(1); Fed. R. Civ. P. 9(b), and any purported undisclosed conduct underlying any omissions claim, *Gamm v. Sanderson Farms Inc.*, 944 F.3d 455, 464-65 (2d Cir. 2019).  Plaintiffs' allegations fail to state a claim for insider trading under these standards, and their claims under Sections 20A and 20(a) necessarily fail for the same reasons, as well as other deficiencies.

**I.     PLAINTIFFS FAIL TO PLEAD INSIDER TRADING BECAUSE THEY DO NOT ALLEGE ANY MISAPPROPRIATION BY DEFENDANTS**

Plaintiffs' sole theory of liability under Section 10(b) is insider trading, but the complaints fail to plead the key element of an insider trading violation, *i.e.*, a misappropriation of confidential information.  *See, e.g.*, *Salman v. United States*, 580 U.S. 39, 41-42 (2016); *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).  An insider trading claim "arises only from 'a fiduciary or other similar relation of trust and confidence.'"  *United States v. Chestman*, 947 F.2d 551, 565 (2d Cir. 1991) (en banc) (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).  Under the "misappropriation theory" of insider trading, a person who is not an insider may commit insider trading by making personal use of confidential information "in breach of a duty of loyalty and confidentiality" to a third party who supplied it, thereby "defraud[ing] the principal of the exclusive use of the information."  *O'Hagan*, 521 U.S. at 652.  Courts also

recognize "tippee" liability, where a person who is not an insider uses confidential information received from a "tipper" who improperly shared it for a personal benefit, where the trader knows that the tipper breached a duty to the source by sharing the information.  *See, e.g.*, *Dirks v. SEC*, 463 U.S. 646, 660 (1983); *Chestman*, 947 F. 2d at 566-67.

Absent allegations that a trader misappropriated (or knew that its tipper had misappropriated) the alleged material nonpublic information, there can be no liability for insider trading.  As the Second Circuit explained in *United States v. Martoma*, "[i]t is thus the breach of a fiduciary duty or other 'duty of loyalty and confidentiality' that is a necessary predicate to insider trading liability."  894 F.3d 64, 73 (2d Cir. 2017) (citation omitted).  This is because trading on confidential information absent a duty not to use that information is not a "deceptive device or contrivance" in violation of Section 10(b), 15 U.S.C. § 78j(b).  *See Dirks*, 463 U.S. at 654.  Mere possession of material nonpublic information does not create any duty to abstain from trading, nor does such a duty "turn on whether the parties to the transaction have 'equal information.'"  *Chestman*, 947 F.2d at 565 (internal citations omitted); *see also Vent v. MARS Snackfood US, LLC*, 350 F. App'x 533, 535 (2d Cir. 2009) (applying *Chestman* in civil case); *accord Chiarella*, 445 U.S. at 235 (holding that insider trading duty "does not arise from the mere possession of nonpublic market information.").  Here, plaintiffs do not allege any facts supporting a duty, and their allegations that defendants purportedly traded on confidential information supplied by Archegos are unavailing as a matter of law.

### A.   The Complaints Do Not Allege That Defendants Traded in Violation of Any Duty to Archegos

The complaints allege no facts to support plaintiffs' contention that Morgan Stanley or Goldman Sachs misappropriated information from Archegos.  Far from misappropriation, the complaints expressly allege that defendants acted pursuant to contractual rights when they sold

shares in response to Archegos's default.  The complaints acknowledge that defendants were contractually entitled to issue margin calls to Archegos in response to declines in the value of its swap positions.  (¶¶ 52-54, 108, 197.)  When Archegos failed to post margin, defendants "issued default notices and/or exercised early termination rights" as to the swaps and, in turn, sold the shares that hedged their swap exposures.  (¶ 206.)  Indeed, in describing Archegos's swap arrangements with defendants, plaintiffs acknowledge that, "if Archegos's position decreased in value by a certain amount *the underlying stocks would have to be sold* in order for Archegos to pay the Counterparties what they were owed under the swap agreements."  (¶ 173 (emphasis added).)  In other words, defendants were entitled to sell the shares they held as hedges if Archegos defaulted by not posting additional margins.  These allegations refute any suggestion that defendants defrauded Archegos "of the exclusive use of [its] information."  *O'Hagan*, 521 U.S. at 652.  Defendants are not aware of any case holding that a margin lender or swap counterparty is liable for insider trading when it sells pledged securities or exits hedges after a defaulting counterparty gives notice that it cannot post margin due to concentrated exposures in those securities.  Such information is not for the "exclusive" use of the defaulting party, and a creditor does not misappropriate that information by invoking contractual remedies to protect itself from loss.

The complaints demonstrate that Archegos expected that defendants were free to exercise their contractual rights upon its default, notwithstanding any information Archegos may have given them—including by selling its pledged securities and their own hedges.  As alleged in the complaints, on March 25 Archegos sought to persuade defendants to forebear from selling and so "thwart a large scale liquidation" that would drive down prices and reduce its recovery.  (¶¶ 199-201.)  In other words, Archegos, accordingly, recognized that, absent a standstill agreement—

which plaintiffs concede was never consummated—Archegos's counterparties, including

defendants, could and would sell.  Defendants' decision to do just that did not breach any duty to

Archegos and is not a deceptive device under Section 10(b).  *See Dirks*, 463 U.S. at 654.

Nor are plaintiffs helped by their repeated, but entirely conclusory, assertion that

defendants owed Archegos a fiduciary or other duty of trust and confidence.  (¶¶ 200, 283-86,

337, 347).  Fiduciary duties do not exist in the absence of a party's agreement or assumption of

such duties, and there are no well-pleaded allegations that defendants agreed to or assumed any

generalized fiduciary duty to Archegos, much less a duty not to sell down their positions in an

event of its default.  *See Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 372 (S.D.N.Y.

2011) ("Generally, commercial transactions do not create fiduciary obligations, absent express

language in the contract, or a prolonged prior course of dealings between the parties establishing

the fiduciary relationship.") (internal quotation marks and citations omitted).  Plaintiffs contend

that defendants owed Archegos a duty of trust and confidence as a result of their "margin

lending, and other brokerage-client relationships, services, and transaction[s]" (¶ 284), but the

law is clear that the relationship between margin lenders or swap dealers and their counterparties

does *not* give rise to any general fiduciary duty.  *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d

529, 536 (2d Cir. 1999) ("[I]n the context of an ordinary broker-client relationship, the broker

owes no fiduciary duty to the purchaser of the security."); *see also XY Planning Network LLC v.

U.S. S.E.C.*, 963 F.3d 244, 247 (2d Cir. 2020) ("Under federal law, investment advisers owe a

fiduciary duty to their clients, but broker-dealers do not."); *United States v. Litvak*, 889 F.3d 56,

61 (2d Cir. 2018) ("A broker-dealer is not, therefore, an agent for its counterparties in these

[bond] trades and owes them no special or fiduciary duty."); *Indep. Ord. of Foresters v. Donald,

Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998) ("[T]here is no general fiduciary duty

inherent in an ordinary broker/customer relationship.").

Plaintiffs fare no better with their bald assertion that defendants owed Archegos a fiduciary duty not to trade "pursuant to written and other express agreements governing the[ir] prime brokerage, margin lending, and other brokerage-client relationships" as well as "their own corporate policies and practices." (¶¶ 283, 285.) Plaintiffs do not identify any terms of any contract or policy to support that assertion. They cite no provision of any document of either Morgan Stanley or Goldman Sachs that assumed any fiduciary or similar duty to Archegos not to exercise their contractual remedies upon an event of default. Plaintiffs supply no detail as to what the supposed contracts or policies say. They do not claim to have seen them. They do not claim that someone with knowledge of their terms has described them for plaintiffs. Their naked assertion is deficient under the PSLRA and Rule 9(b), because the complaints supply no grounds for plaintiffs' purported "belief" about defendants' supposed contracts and policies. 15 U.S.C. § 78u-4(b)(1); *see also Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (allegations must describe sources "with sufficient particularity to support the probability" that they "possess the information alleged"); *see generally Gamm*, 944 F.3d at 462-63.[3]

Indeed, plaintiffs' complaints—which acknowledge defendants' margin policies and their assertion of their contractual rights in declaring Archegos in default and liquidating the securities associated with Archegos's margin accounts and swaps (¶¶ 151, 206)—refute any notion that those same policies and contracts imposed a duty on defendants *not* to trade in response to

---

[3] Plaintiffs do not even satisfy Rule 8(a)'s more relaxed standards, which require a plaintiff to plead the "material terms" that allegedly were breached. *See, e.g.*, *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 625 (S.D.N.Y. 2013) (granting motion to dismiss in part where plaintiff failed to identify "with any specificity the 'material' or 'express or implied' terms referenced in his Complaint, nor how any of the contracts' terms were violated in any specific instance"); *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 451 (S.D.N.Y. 2021) ("Conclusory allegations that a contract existed or that it was breached do not suffice.") (internal quotation marks and citation omitted).

Archegos's failure to meet its margin calls.  Any such contract term or corporate policy that prohibited defendants from exercising their remedies in an event of default would be self-defeating, and is therefore implausible on its face.  *See, e.g.*, *N.Y. Indep. Contractors All., Inc. v. Consol. Edison Co.*, 2017 WL 773600, at *4 (S.D.N.Y. Feb. 27, 2017) (dismissing complaint because, among other reasons, it "contain[ed] no explanation for why [defendant] would enter into such an implausible agreement").  Moreover, even if plaintiffs' assertions of a duty were properly and logically supported, defendants' internal policies and practices are not sufficient, as a matter of law, to create fiduciary or other similar duties to Archegos.  *See de Kwiatkowski v. Bear, Stearns & Co.*, 306 F. 3d 1293, 1311 (2d Cir. 2002) (noting that courts "have sensibly declined to infer legal duties from internal 'house rules' or industry norms that advocate greater vigilance than otherwise required by law.").

Plaintiffs allege that Archegos provided confidential information about its assets and exposures to defendants pursuant to its contractual relationships with them (¶ 200), but that is not enough to allege a fiduciary duty not to trade.  There is no allegation that Archegos conditioned its provision of any confidential information on an agreement that they would not use it, and, in particular, that they would not unwind their hedges upon Archegos's default.  To the contrary, the complaints allege that Archegos shared information with its counterparties about its liquidity and the size of its portfolio for their own use as counterparties in setting margin requirements, lending rates and trading limits—*i.e.*, precisely in order to manage their exposures to Archegos. (¶¶ 119, 152, 156-57, 161, 166, 168; *see also* ¶¶ 52-58.)  But in any event, Archegos's alleged provision of information to defendants in confidence would impose "no duty to observe that confidence" on an arm's length counterparty, absent an actual "agreement or understanding," *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 (2d Cir. 1980); *see also Chestman*, 947 F.2d

at 567 ("[A] fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information."). No facts are alleged as to such an agreement or understanding.

As a last-ditch effort, plaintiffs assert that defendants' supposed duty to Archegos arose under "express agreements" they purportedly made "in connection with Archegos's March 2021 non-public efforts to coordinate a collective standstill, forbearance, managed liquidation, or similar agreement." (¶ 286.) But there was no agreement to refrain from trading after the March 25 call between Archegos and its counterparties. (¶ 203.) Absent an agreement to forbear from trading, plaintiffs' assertion that Archegos provided material nonpublic information to defendants (¶¶ 1, 7-8, 14-16, 112, 200, 204) is unavailing, because receipt of material nonpublic information does not, in itself, give rise to any duty not to trade. *Chestman*, 947 F.2d at 568 ("Reposing confidential information in another, then, does not by itself create a fiduciary relationship."). Nor were defendants foreclosed from trading because they purportedly knew that they and Archegos's other counterparties would flood the markets with stock as they unwound their swaps. (¶¶ 16, 204-06.) There is no "general duty between all participants in market transactions to forgo actions based on material, nonpublic information." *Chiarella*, 445 U.S. at 233. An informational advantage does not create a duty not to trade. *Dirks*, 463 U.S. at 657.

But even if defendants somehow *were* Archegos's fiduciaries, their trading while allegedly in possession of Archegos's confidential information still would not constitute misappropriation, because they disclosed their intent to trade. The complaints allege that defendants informed Archegos—through "default notices and/or exercise[] [of] early termination rights"—that they would be liquidating its accounts and unwinding their hedges before they began selling on March 26. (¶ 206.) Such "disclosure forecloses liability under the misappropriation theory" because where a trader "discloses to the source that he plans to trade

on . . . nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation."
*O'Hagan*, 521 U.S. at 655; *see also SEC v. One or More Unknown Traders in Sec. of Onyx
Pharms., Inc.*, 296 F.R.D. 241, 249 (S.D.N.Y. 2013) ("A misappropriator can avoid liability by
disclosing the fact that she will be trading on confidential information to her source; by doing so,
the misappropriator is no longer deceiving her source, and thus she is not violating §10(b).").[4]

The complaints make clear that everyone, including Archegos, understood that
defendants were free to do exactly what plaintiffs allege they did: exercise their early termination
rights, liquidate Archegos's margin accounts and unwind their hedges.  (¶¶ 200, 206.)  The
complaints' many pages about the supposed "Fallout" from Archegos's collapse (¶¶ 209-81) are
irrelevant, because nothing in that rendition undercuts the controlling legal facts that defendants
were entitled to issue notices of default, terminate their swap transactions and unwind their
hedges upon Archegos's default.

### B.     The Complaints Do Not Allege That Defendants Are Liable as Archegos's Tippees

As an alternative theory of liability, plaintiffs assert that defendants traded in violation of
a duty they owed to the companies whose stock they sold, arguing that Archegos was an
"insider" of these companies and that defendants were tippees of Archegos.  (¶ 287.)  This novel
application of the tipper/tippee theory finds no support in the law or in any well-pleaded
allegation.

---

[4] Insofar as the complaints allege that Morgan Stanley and Goldman Sachs engaged in trading on
March 25, 2021, those sales are not actionable because, according to the complaints, Archegos
affirmatively asked defendants to sell its securities and consented to those sales.  (¶¶ 200, 204.)  Such
trading at Archegos's direction and with its consent is not misappropriation.  *See O'Hagan*, 521 U.S. at
655.

As an initial matter, because tippee liability is derivative, a tippee can be liable only if the tipper—here, Archegos—has itself misappropriated information in violation of a fiduciary duty owed to the source. *Dirks*, 463 U.S. at 660 (holding that tippee assumes fiduciary duty not to trade "*only* when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee") (emphasis added); *Chestman*, 947 F.2d at 566 (noting that "the predicate act of fraud" may "be perpetrated on the source of the nonpublic information"). But the information that Archegos purportedly shared with defendants was not sourced *from the issuers*. It was Archegos's *own* information, about its *own* trading positions. There is no allegation that Archegos misappropriated—or even possessed—any information from the issuers or their shareholders, or that Archegos had any communications with the issuers *at all*.

Nor do the complaints plead that Archegos had a fiduciary relationship with any of the issuers. Plaintiffs argue that Archegos should be considered a beneficial owner of the issuers' shares through its swap exposures, and that it was required to publicly report its holdings under Section 13 of the Exchange Act.[5] (¶¶ 16, 104-05, 290, 295.) But whether or not that is true— which defendants do not concede—plaintiffs' assertion fails to establish that Archegos had any duty not to trade or not to share information about its own positions with defendants for their own use. A beneficial owner with reporting obligations is not a fiduciary of the company in which it invests. *Cf. Capasso v. Cigna Ins. Co.*, 765 F. Supp. 839, 841 (S.D.N.Y. 1991) (distinguishing statutory and fiduciary disclosure duties in context of fraud and RICO claims). Archegos did not obtain any of the information that it purportedly shared with defendants from the issuers , much less "in the context of 'a special confidential relationship.'" *Chestman*, 947

---

[5] Plaintiffs concede that Goldman Sachs and Morgan Stanley—the actual owners of the hedge positions—did report their positions pursuant to Section 13 as required. (¶¶ 101, 299, 304.)

F.2d at 565.

Finally, plaintiffs' tippee theory fails for the independent reason that the complaints do not plead that defendants knew that Archegos was sharing information in breach of a fiduciary duty that it owed to the issuers or its shareholders. A tippee can be held liable only where "the tippee knows or should know that there has been a breach" by the tipper. *Dirks*, 463 U.S. at 660. Plaintiffs contend that defendants' discussions with Archegos "should have alerted the defendants to the fact that Archegos's overall portfolio was highly leveraged and concentrated in a handful of shares" (¶ 185), but those alleged discussions hardly demonstrate knowledge by defendants that Archegos was wrongly conveying information obtained in confidence from the issuers.[6]

## II.   THE SECTION 10(b) CLAIMS FAIL BECAUSE PLAINTIFFS DO NOT ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

Plaintiffs' Section 10(b) claims should be dismissed because they fail to plead scienter, which is a necessary element of every Section 10(b) claim. Scienter encompasses "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n.12 (1976)). Under the PSLRA, plaintiffs must plead a "strong inference" of scienter, which requires the court to "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. The inference that the defendant acted with scienter must be "cogent and at least as compelling as any opposing inference one could draw

---

[6] Moreover, it is clear from the complaints brought by the DOJ, SEC and CFTC that many of plaintiffs' allegations about "counterparties" involve entities other than Goldman Sachs or Morgan Stanley. For example, paragraph 170(a) is substantially similar to paragraph 52(a) of the DOJ indictment, which describes a meeting between Archegos and *Credit Suisse*, and paragraphs 170(d) and (f) correspond to paragraphs 52(b) and (c) of the DOJ indictment, both of which describe discussions between Archegos and *UBS*.

from the facts alleged." *Id.*  To plead scienter with particularity, "a complaint must allege facts showing (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022) (internal quotation marks and citation omitted).  In the insider trading context, plaintiffs are required to allege with particularly that "at the moment of tipping or trading," the defendant "must know or be reckless in not knowing that the conduct was deceptive." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012).

The inference of scienter that plaintiffs urge the Court to draw fails this standard. Plaintiffs assert that "Defendants Goldman Sachs and Morgan Stanley possessed MNPI [material nonpublic information] at the time they engaged in the stock sales described herein," and that the alleged "possession of this knowledge while trading demonstrates their scienter."  (¶ 308.)  But such "bare-bones allegations are insufficient to raise a strong inference of scienter."  *See Gordon*, 962 F. Supp. 2d at 531 (dismissing insider trading claim for no scienter).  Plaintiffs' argument wrongly equates trading with material, non-public information with scienter, which would render the scienter element meaningless.  As discussed above, there must also be a misappropriation, which is both a breach of duty and a basis for pleading scienter.  But the complaint provides no basis to think that defendants believed that, in closing out their exposures, they were improperly exploiting information in breach of any duty to Archegos or anyone else—as would be necessary to plead scienter for a claim of insider trading.  *See Obus*, 693 F.3d at 286 (trader "must understand that [trading on] the information would be violating a confidence.").

Plaintiffs' allege that *Archegos* engaged in manipulative trading practices and used swaps to avoid reporting requirements under Section 13 (¶¶ 12, 104, 137, 141, 268-81), but the complaints allege no facts suggesting that *defendants* knowingly participated in that scheme.  As

plaintiffs concede, defendants repeatedly received false or incomplete information from Archegos about its portfolio (¶¶ 178-79, 182-84).  *See, e.g.*, *W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 F. App'x 717, 720 (2d Cir. 2009) (no scienter where "the more compelling inference" was that "Doral deceived Pricewaterhouse with" manipulated valuations); *In re Satyam Comp. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 481 (S.D.N.Y. 2013) (no scienter where allegations "only reinforce the inference that the AC Defendants were themselves victims of the fraud").

Far from pleading a strong inference of scienter, the alleged facts actually demonstrate a more plausible non-fraudulent alternative explanation for defendants' conduct:  in response to Archegos's defaults, defendants exercised their contractual remedies to terminate their swaps and reduce their exposures—just as they would do in response to *any other counterparty's default*. There is no allegation that they took these actions because they had learned of any scheme or manipulation by Archegos.  The complaints' allegations that defendants "terminated the swaps and exited the associated hedges" fails to plead that they acted with an intent to defraud. Rather, as this Court has previously held, such allegations "suggest only that [the defendant] was taking legitimate business steps to protect its own credit position," which do not give rise to scienter as a matter of law.  *See Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 426 (S.D.N.Y. 2008) (dismissing claim against clearing broker for failure to allege manipulative trading or scienter), *aff'd in part, vacated in part on other grounds* by 716 F.3d 18 *and* 527 F. App'x 89 (2d Cir. 2013) (affirming dismissal of clearing broker claims in full "for substantially the reasons stated by the District Court"); *see also Ross v. Bolton*, 639 F. Supp. 323, 327 (S.D.N.Y. 1986) (trading "to reduce the amount owed" pursuant to "a loan of money under margin" does not reflect conscious misbehavior).  And as the Second Circuit has held in numerous contexts, conduct undertaken to further ordinary business and profit motives does not

support a strong inference of scienter.  *See, e.g.*, *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor . . . does not support a strong inference of fraudulent intent.").  Plaintiffs have not alleged anything more here.

## III.    PLAINTIFFS' SECTION 10(b) CLAIMS FAIL BECAUSE PLAINTIFFS DO NOT ALLEGE LOSS CAUSATION

Loss causation is an independent basis to dismiss plaintiffs' Section 10(b) and Rule 10b-5 claims.  To plead loss causation, a plaintiff must allege that "the subject of the fraudulent statement or omission" is the "cause of the actual loss suffered, i.e. that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

Here, plaintiffs fail to allege "that the defendant[s'] deceptive conduct caused their claimed economic loss."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011).  Plaintiffs devote a sum total of two paragraphs in their complaints to loss causation.  (¶¶ 317-18.)  They allege that defendants traded on supposed confidential information, and plaintiffs purportedly suffered losses "[l]ater, when the information became publicly known, [and] the price of the . . . Issuers' securities declined sharply as a result of such disclosure."  (*Id.*; *see also* ¶ 22 (alleging that plaintiff "was damaged when the MNPI was disclosed at the end of the Class Period and the price of [the issuers'] stock declined as a result").)  But plaintiffs do not allege any facts about *what* information became publicly known, *how* it became known or *when* it became known.

Moreover, plaintiffs allege that the issuers' stock prices were already declining before defendants purportedly acquired confidential information through the March 25, 2021 phone call.  (*See* ¶ 16 at 10 (alleging that Archegos's positions had declined during the week of March

22, 2021 prior to March 25); *see also* ¶¶ 186-87, 193)  The complaints do not and could not attribute these declines to defendants, and they do not include factual allegations that would show that the losses were caused by something *defendants* did, as opposed to conduct by others. *See Lentell*, 396 F.3d at 174-75.  For the same reason, plaintiffs' allegation elsewhere that stock prices declined following the sales by *other* Archegos counterparties on March 26, 2021 and later does not plead loss causation.  (¶ 206.)  Plaintiffs do not allege that defendants caused these other counterparties to trade, or that these entities would not have sold their shares but for defendants' actions.  Finally, plaintiffs' allegation that they suffered "economic loss" "[a]s a result of their purchases" of the issuers' securities (¶ 318) is not an allegation of loss causation. Plaintiffs' allegation that the stock they purchased lost value does not "speak to the relationship between the [alleged] fraud and the loss of the[ir] investment." *Lentell*, 396 F.3d at 174.

## IV.   THE SECTION 20A AND 20(a) CLAIMS FAIL FOR LACK OF A PRIMARY VIOLATION AND ADDITIONAL REASONS

Plaintiffs' failure to plead a predicate violation of Section 10(b) and Rule 10b-5 is also fatal to their Section 20A claims and Section 20(a) claims because both types of claims require predicate allegations that the defendant otherwise violated the Exchange Act.  *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 152 (2d Cir. 2021) ("Actions under either section [20(a) or 20A] require an independent violation of the Exchange Act.") (citing *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 704 (2d Cir. 1994)); *see also City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 491 (S.D.N.Y. 2021) (dismissing Section 20(a) and 20A claims "[b]ecause Plaintiffs have failed [to] state a claim for a violation of section 10(b)").  Those claims fail for other reasons as well.

A.       **The Section 20A Claims in *Felix* and *Scully* Must Be Dismissed
           Because Lead Plaintiffs Do Not Allege Contemporaneous Trading**

The Section 20A claims asserted by the lead plaintiffs in the *Felix* (IQIYI) and *Scully*

(Baidu) actions should also be dismissed because those plaintiffs have not alleged that they

traded contemporaneously.  A plaintiff may not recover under Section 20A for purchases made

*before* the defendant allegedly engaged in unlawful insider trading.  *See O'Connor & Assocs. v.*

*Dean Witter Reynolds, Inc.*, 559 F. Supp. 800, 803 (S.D.N.Y. 1983) ("[L]iability does not extend

to those who traded prior to the defendant's breach of his duty to 'disclose or abstain'—that is,

prior to the date of the defendant's trades."); *see also In re Take-Two Interactive Sec. Litig.*, 551

F. Supp. 3d 247, 311 n.51 (S.D.N.Y. 2008) (same); *In re Aceto Corp. Sec. Litig.*, 2021 WL

4350501, at *10 (E.D.N.Y. Mar. 16, 2021) (same).  This is so because "[u]ntil the defendant

trades he has not violated his obligation either to disclose or to abstain from trading, because that

obligation has not yet come into existence." *O'Connor & Assocs.*, 559 F. Supp. at 803.  Here,

the only alleged sales by defendants that occurred after they allegedly obtained Archegos's

confidential information on the March 25 call were executed the following day, on March 26.

(¶¶ 8, 206.)  But the PSLRA certifications executed by the lead plaintiffs in the *Felix* and *Scully*

cases show that these plaintiffs purchased only on March 23 and March 24, 2021—*i.e.*, before

defendants' alleged sales on March 26.[7]  These lead plaintiffs did not trade contemporaneously

with defendants, and accordingly the *Felix* and *Scully* actions must be dismissed.  *See O'Connor*

*& Assocs.*, 559 F. Supp. at 803.

---

[7] Am. Compl. ¶ 22, ECF 40 & PSLRA Cert., ECF 26-2, *Felix*, No. 1:21-cv-10286 (bought on
3/24/2021); Am. Compl. ¶ 22, ECF 39 & PSLRA Cert., ECF 25-2, 25-4, *Scully*, No. 1:21-cv-10791
(bought on 3/23-24/2021).

**B.      The Section 20(a) Claims Fail Because Plaintiffs Do Not Allege
          That Defendants Exercised Control Over Any Relevant Actor**

Plaintiffs' Section 20(a) claims independently fail because plaintiffs have not alleged *any*

control by defendants.  To plead a control person claim, a plaintiff must allege that the

defendants had the actual ability to control and, in fact, exercised control over the primary

violators with respect to the conduct at issue.  *See In re Alstom SA*, 406 F. Supp. 2d 433, 496

(S.D.N.Y. 2005) (dismissing Section 20(a) claim for alleging "boilerplate language" in place of

factual allegations of control).  Plaintiffs do not identify anyone whom defendants purportedly

controlled who allegedly engaged in insider trading.  Plaintiffs generically allege that defendants

"controlled each of their employees" (¶357), but no specific employees are alleged to have

traded on confidential information.  As a result, Plaintiffs' 20(a) claims must be dismissed.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant their

motions to dismiss the amended complaints with prejudice.

Dated: August 12, 2022             **DAVIS POLK & WARDWELL LLP**

                                   By: /s/ *Charles S. Duggan*
                                   Charles S. Duggan
                                   Daniel J. Schwartz
                                   450 Lexington Avenue
                                   New York, NY 10017
                                   Telephone: (212) 450-4000
                                   charles.duggan@davispolk.com
                                   daniel.schwartz@davispolk.com

                                   *Counsel for Defendant Morgan Stanley*

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

By: /s/ *Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.
Olivia Everton
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
cboccuzzi@cgsh.com
oeverton@cgsh.com

*Counsel for Defendant Goldman Sachs Group, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 12, 2022, the foregoing

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS

THE AMENDED CLASS ACTION COMPLAINTS was electronically filed with the Clerk of

Court using the CM/ECF system that will send notification of such filing to all counsel of record.

By:      /s/ *Charles S. Duggan*
         Charles S. Duggan