UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHEW KING TAN, Individually and on Behalf of
All Others Similarly Situated,

*Plaintiff,*

v.

GOLDMAN SACHS GROUP INC. and
MORGAN STANLEY

*Defendants.*

---

THIS DOCUMENT RELATES TO:[1]

1:21-cv-08618-PAC
1:21-cv-08752-PAC
1:21-cv-08897-PAC
1:21-cv-10286-PAC
1:21-cv-10791-PAC
1:22-cv-00169-PAC

No. 21-CV-8413 (PAC)

**OPINION & ORDER**

---

Defendants Goldman Sachs Group Inc. ("Goldman Sachs") and Morgan Stanley (collectively, "Defendants") move to dismiss the Amended Complaints in several coordinated actions[2] for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Defendants' motion to dismiss is **GRANTED**.

---

[1] This motion concerns a series of related cases, all dealing with Defendants' conduct with non-party Archegos over the course of March 2021. The Court refers in this Opinion only to the Amended Complaint ("Complaint") in *Tan v. Goldman Sachs*, No. 21-CV-8413 (PAC), ECF No. 54, one of the consolidated cases, consistent with the briefing of the parties.

[2] Case Nos. 1:21-cv-08618-PAC, 1:21-cv-08752-PAC, 1:21-cv-08897-PAC, 1:21-cv-10286-PAC, 1:21-cv-10791-PAC, 1:22-cv-00169-PAC.

## BACKGROUND

Each Plaintiff in these coordinated actions represents a class of investors in: Vipshop Holdings Ltd. ("Vipshop"); Gaotu Techedu Inc., formerly known as GSX Techedu Inc., ("Gaotu"); Tencent Music Entertainment Group ("Tencent"); ViacomCBS, Inc. ("ViacomCBS"); IQIYI, Inc. ("IQIYI"); Baidu, Inc. ("Baidu"); and Discovery, Inc. ("Discovery"; collectively, the "Issuers"). Compl. ¶ 2, ECF No. 54. These are the Issuers in which Archegos Capital Management, LP and Archegos Fund, LP (collectively, "Archegos") acquired "large, non-public positions" by March 22, 2021. *Id.* Plaintiffs' claims center on a market manipulation scheme perpetuated by Archegos through these nonpublic positions that lead to the eventual collapse of its entire portfolio. *Tan v. Goldman Sachs Grp. Inc.*, No. 1:21-CV-08413-PAC, 2022 WL 718395, at *1 (S.D.N.Y. Mar. 10, 2022). Plaintiffs allege that Defendants, two of Archegos' prime brokers, possessed material non-public information ("MNPI") about Archegos' imminent collapse and engaged in a series of trades before MNPI became public, materially harming the Issuer's investors. Compl. ¶ 1. The following facts are alleged in the Complaint and documents incorporated by reference therein and are taken as true. *See Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 299 n.1 (2d Cir. 2021).

## I.   The Relationship Between Defendants and Archegos

Prior to its collapse, Archegos was a family office headquartered in New York, New York that managed over $36 billion in investment capital. Compl. ¶ 25. Archegos was wholly operated by Sung Kook (or Bill) Hwang "for the [] purpose of managing and investing the assets of Hwang and the Hwang's [*sic*] family." *Id.* ¶ 27. Archegos was founded in approximately 2013, after Hwang's previous venture—Tiger Asia Fund—underwent a series of legal troubles involving insider trading and wire fraud. *Id.* ¶¶ 91–93. In 2012, Tiger Asia Fund settled with the SEC on the claims, pleaded guilty to criminal wire fraud, and Hwang was banned from "managing money

on behalf of clients for at least five years." *Id.* Under these circumstances, Hwang brought Archegos into being.

Despite its billing as a family office (which allowed Archegos to to escape SEC scrutiny), Archegos was a sophisticated operation with 50 employees and numerous brokers. *Id.* ¶¶ 94–95. Between 2020 and 2021, Archegos "began building extraordinarily large positions in a scattering of securities." *Id.* ¶¶ 97–98.

Beginning in spring 2020 and continuing through March 2021, Archegos, along with its securities brokers and a number of other Counterparties (including Defendants), engaged in a series of total return swaps ("TRS"). *Id.* ¶¶ 97, 114–115. A TRS is a form of synthetic financing and is an alternative to a more traditional form of margin lending. *Id.* ¶ 56. Under a TRS, two parties jointly engage in the purchase of an asset, generally some form of security: the broker (in this case, each Defendant) and the client (in this case, Archegos). *Id.* While the client produces a marginal percentage of the value of the asset, the broker provides funding for the remainder of the asset. *Id.* ¶ 57. The client, through this funding, "purchases" the asset, but the broker continues to hold title. *Id.* ¶ 58. Thus, the client essentially leases it from the broker, holding a certain, attenuated interest connected to the financial performance of the asset. *Id.* Thus, if the security appreciates in value, the client receives the benefit of the appreciation. *Id.* ¶ 57. The broker, on the other hand, earns interest on the financing and, if the asset depreciates in value, the ability to make a "margin call" on its financing. *Id.* ¶¶ 56, 60. The margin call allows the broker to call upon the client and demand payment of the difference between the initial price of the asset and the depreciation in value. *Id.* ¶ 54. This shifts the risk associated with the asset from the broker to the client. *Id.* ¶¶ 56, 60.

Other courts in this Circuit have noted the implications of TRS agreements. For example, as the Honorable Lewis A. Kaplan articulated,

> [i]n practical economic terms, a TRS referenced to stock places the [client] in substantially the same economic position that it would occupy if it owned the referenced stock or security. There are two notable exceptions. First, since it does not have record ownership of the referenced shares, it does not have the right to vote them. Second, [client] looks to the [broker], rather than to the issuer of the referenced security for distributions and the marketplace for any appreciation in value.

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511, 521 (S.D.N.Y.), *aff'd*, 292 F. App'x 133 (2d Cir. 2008), *and aff'd in part, vacated in part, remanded*, 654 F.3d 276 (2d Cir. 2011). Further, as the Honorable Andrew Borrok described in connection with the Archegos scheme at issue here, "[b]ecause the underlying securities do not appear on the investor's balance sheet, even if the investor acquires a substantial exposure (as Archegos did), the position may not be publicly known as the investor need not file a Form 13D with the SEC." *Camelot Event Driven Fund v. Morgan Stanley & Co. LLC*, 182 N.Y.S.3d 602 (N.Y. Sup. Ct. 2023).

In 2020 and 2021, Defendants and several other entities (including several other large prime brokers) acted as counterparties (collectively, "Counterparties") in TRS agreements with Archegos. When the Counterparties would undertake TRS agreements, "Defendants Morgan Stanley, Goldman Sachs, and the Counterparties ensured that any corollary synthetic exposure . . . was fully hedged." *Id.* ¶ 111. To ensure that this exposure was adequately hedged, whenever Defendants "filled Archegos's orders," they would simultaneously purchase their own shares in the Issuers. Consequently, as the Counterparties filled Archegos's orders, they contemporaneously purchased their own shares from the Issuers to hedge any synthetic exposure created by the TRSs. *Id.*

Between mid-November 2020 and late March 2021, Archegos established positions pursuant to this type of swap arrangement, each exceeding $5 billion in 8 different Issuers—the

investors of which are now Plaintiffs in these cases. *Id.* ¶ 98. By relying on the TRS format, Archegos ensured it would never legally take more than 5% ownership in any of the Issuers itself. *Id.* ¶ 104. This allowed Archegos to avoid regulatory disclosure requirements that would otherwise attach to a concentrated interest. *Id.* Instead, the Counterparties took positions in these Issuers, and with it, the regulatory disclosure requirements. Contrary to the perception that this arrangement gave, between January and March 2021, "Archegos's trading equities and TRSs referring its top 10 holdings regularly exceeded 20%, often reached 30%, and even surpassed 40% of the daily trading volume of certain companies." *Id.* ¶ 129. Archegos's massive stakes in these stocks created upward pressure on the share prices, particularly as Archegos traded the stocks at large volumes. *Id.* ¶ 130. During this time, therefore, Archegos conducted a multi-billion-dollar market manipulation scheme, manipulating the Issuer stock prices through a form of secretive ownership of massive positions in TRSs. *Id.* ¶ 137.

As Archegos perpetuated its scheme, it continued to concentrate its positions in Issuer securities through more TRS agreements. *Id.* ¶ 155. As Archegos increased its positions on certain securities, its Counterparties undertook preventative actions to manage the risk of Archegos's increased positions—including "requiring that Archegos maintain a certain ratio of long to short positions" and "Broad-Based Security Index Swaps"; and increasing its hedges in the same Issuers to protect its position. *Id.* ¶¶ 111, 163. This form of TRS hedging is an "industry standard" in protecting a TRS agreement for brokers. *Id.* ¶ 111.

## II.  The Fall of Archegos

On March 23, 2021, following a $2 billion secondary public stock offering, the ViacomCBS stock price fell significantly. *Id.* ¶ 187. The dip left Archegos fatally undercapitalized and overleveraged because of it held an overly concentrated position in the ViacomCBS securities.

Archegos's vulnerable position was exacerbated when several other Issuers (namely, Gaotu, IQIY, Baidu, and Tencent) saw a dip in their own stock prices at the same time. *Id.* ¶ 193. After a series of unsuccessful attempts to cover the losses—including facilitating a block trade with Goldman Sachs—Archegos had to acknowledge that it had no funding to meet the demand of its investors. *Id.* ¶¶ 197, 200. Plaintiffs allege that, from March 24–26, 2021, Archegos held several phone calls with all of its Counterparties acknowledging its dire financial situation. *Id.* ¶¶ 197, 199, 202. Archegos "asked Defendants Morgan Stanley, Goldman Sachs, and other Counterparties to enter into a standstill agreement whereby they would agree not to declare Archegos in default while the latter wound down its positions." *Id.* ¶ 201. Talks between Archegos and the Counterparties began on March 24, going well into March 26, as the parties discussed the possibility of a managed liquidation of Archegos's position with each Issuer. *Id.* ¶ 202. Ultimately, talks ended up being "fruitless" and neither Defendant participated in a managed liquidation of Archegos. *Id.* ¶ 203. On March 26, 2021, Defendants both terminated their agreements with Archegos and issued notices of default. *Id.* ¶ 206. Both Defendants—as well as several other Counterparties—executed block trades in connection with their Archegos-linked stocks, "terminated the swaps and exited the associated hedges by selling the same securities referenced in the swaps into the market." *Id.* The market flooded with stocks and the Issuers' stock prices plummeted. *Id.* Counterparties that were slower to sell ended up unwinding their shares with Archegos at fire sale prices. *Id.* ¶ 207. As a result, these slower-to-act Counterparties took much larger financial hits than Defendants who were able to get out ahead of the total price collapse. *Id.*

This serves as the crux of Plaintiff's claims. They allege that Defendants avoided tens of millions of dollars in damages by selling its Archegos-linked stock when it did. *Id.* ¶ 343. Within a week of March 23, 2021, the date of ViacomCBS's initial stock price depreciation, Archegos

collapsed entirely and "the investors who purchased the relevant stocks, including those of the Issuers', at artificial prices lost the value they believed their investments held." *Id.* ¶ 208.

Since the fall of Archegos, several Archegos executives have been indicted on (with some pleading guilty to) widespread securities fraud stemming from its unstable TRS positions. *Id.* ¶ 11. According to one federal grand jury indictment, Archegos executives were in part charged with "systematically [misleading] the Counterparties in order to obtain additional trading capacity and margin lending to further support Archegos's inflated positions." Indictment ¶ 47, *United States v. Hwang*, No. 1:22-cr-00240-AKH (S.D.N.Y. filed Apr. 25, 2022), ECF No. 1. The Securities Exchange Commission ("SEC"), also pursued action against Bill Hwang, noting in its complaint that to avoid limits of its Counterparties' trading capacities, "despite varying degrees and quality of risk management and proactive questioning of Archegos by its Counterparties – Archegos, through Hwang, Halligan, Tomita, and Becker, deliberately misled many of Archegos's Counterparties during the Relevant Period in order to obtain increased trading capacity to further its manipulative trading and ever-increasing ramp-up of exposures." Compl. ¶ 5, *S.E.C. v. Hwang*, 22-cv-03402 (S.D.N.Y. Apr. 27, 2022), ECF No. 1.[3] Plaintiffs also allege that both Defendants are now subject to governmental investigations into their use of block trades with hedge fund clients. *Id.* ¶ 42. Plaintiffs—stockholders of the Issuers who held stack between March 22 and 27, 2021—filed these actions. Plaintiffs allege Defendants engaged in insider trading in violation of (1) Section 10(b) of the Exchange Act and Rule 10b-5, 15 U.S.C. § 78(j), 17 C.F.R. § 240.10b-5; (2) Section 20A of the Exchange Act, 15 U.S.C. § 78t-1; and (3) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t. "The ten complaints are virtually identical—asserting identical causes of

---

[3] *See also Hwang*, No. 1:22-cr-00240-AKH (S.D.N.Y. filed Apr. 25, 2022), ECF No. 47 (Am. Compl.).

action based on identical factual circumstances, and alleging identical underlying conduct by identical defendants across identical time periods." *Tan*, 2022 WL 718395, at *1. The Court therefore addresses their arguments collectively.

## DISCUSSION

### I.   Legal Standard for a Motion to Dismiss

When considering a Rule 12(b)(6) motion, the Court accepts as true all factual allegations contained in the complaint and draws all reasonable inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court does not "assay the weight of the evidence which might be offered," but rather the complaint's "legal feasibility." *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011) (internal quotation marks and citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Allegations of securities fraud must meet the heightened pleading standards of Fed. R. Civ. P. 9(b): in alleging fraud or mistake, a party must state "with particularity the circumstances constituting fraud or mistake." *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under this standard, plaintiffs alleging fraud must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99.

A securities fraud complaint pursued by private parties must also meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that a viable securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or

scienter, with respect to each act or omission.  15 U.S.C. § 78u-4(b)(2).  That requisite state of

mind is "an intent 'to deceive, manipulate, or defraud.'"  *ECA*, 553 F.3d at 198 (quoting *Tellabs,*

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  "[T]he inference of scienter must

be more than merely 'reasonable' or 'permissible;'" it must be "at least as compelling as any

opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  In the

Second Circuit, the requisite scienter "can be established by alleging facts to show either (1) that

defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence

of conscious misbehavior or recklessness."  *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500,

514–15 (S.D.N.Y. Feb. 17, 2011).

## II.   <u>Violations of 10b-5</u>

"Insider trading—unlawful trading in securities based on material non-public

information—is well established as a violation of section 10(b) of the Securities Exchange Act of

1934 and Rule 10b-5."  *S.E.C. v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012).  "Under the classical

theory of insider trading, a corporate insider is prohibited from trading shares of that corporation

based on material non-public information in violation of the duty of trust and confidence insiders

owe to shareholders." *Id.* (citing  *Chiarella v. United States*, 445 U.S. 222, 228, (1980)).  There

also exists a second theory of insider trading through misappropriation, which "targets persons

who are not corporate insiders but to whom material non-public information has been entrusted in

confidence and who breach a fiduciary duty to the source of the information to gain personal profit

in the securities market."  *Id.* (quoting *United States v. O'Hagan*, 521 U.S. 642, 652 (1997)).

Essentially, a plaintiff must allege the trader breached a fiduciary duty to either shareholders or to

a source of confidential information.  *Id.* at 285.  Both traditional and misappropriation theory

attach liability where the defendant acts on a tip from an insider or misappropriator.  To plead

tippee liability, a plaintiff must allege "two elements: (i) a breach by the tipper of a duty owed to the owner of the nonpublic information; and (ii) the tippee's knowledge that the tipper had breached the duty." *United States v. Libera*, 989 F.2d 596, 600 (2d Cir. 1993). "[A] tippee may be civilly liable when: 1) he knew or had reason to know that the tipper disclosed that information in breach of a duty and received a personal benefit in the process and 2) the tippee used that information by trading or tipping for his own benefit in disregard of that knowledge." *United States v. Blaszczak*, 56 F.4th 230, 248 (2d Cir. 2022) (Walker, J. concurring); *see also Dirks v. S.E.C.*, 463 U.S. 646, 663 (1983). Absent a personal benefit, liability may still attach if the tippee knew the tipper gifted the MNPI with an expectation that he would trade on it. *See Salman v. United States*, 580 U.S. 39, 137 S. Ct. 420, 424 (2016).

## III.   Misappropriation

First, Plaintiffs allege that Defendants breached an alleged duty to Archegos by misappropriating the MNPI regarding Archegos collapse that Archegos conveyed to Defendants over the week of March 24, 2021. Under the misappropriation theory of insider trading, "one who misappropriates nonpublic information in breach of a fiduciary duty and trades on that information to his own advantage violates Section 10(b) and Rule 10b–5." *United States v. Chestman*, 947 F.2d 551, 564 (2d Cir. 1991) (quotations omitted); *see also United States v. O'Hagan*, 521 U.S. 642 (1997). "To prove liability, a plaintiff must establish '(1) that the defendant possessed material, nonpublic information; (2) which he had a duty to keep confidential; and (3) that the defendant breached his duty by acting on or revealing the information in question.'" *S.E.C. v. Suman*, 684 F. Supp. 2d 378, 387 (S.D.N.Y. 2010), *aff'd*, 421 F. App'x 86 (2d Cir. 2011) (quoting *S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 541 (S.D.N.Y. 2009)).

The parties do not dispute for the purposes of the instant motion that Defendants possessed material, nonpublic information related to the Issuers, nor that they traded on that information. This is not the end of the inquiry, however, because trading on MNPI alone does not constitute insider trading. *See Chiarella*, 445 U.S. at 228 ("[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so."). Defendants argue that did not owe a fiduciary duty to Archegos, the source of their information.

Under Rule 10b, a duty of confidence may arise where "the party in whom confidence is reposed has entered into a relationship in which he or she acts to serve the interests of the party entrusting him or her with such information." *United States v. Falcone*, 257 F.3d 226, 234–35 (2d Cir. 2001). "Relationships that give rise to duties of trust and confidence are 'marked by the fact that the party in whom confidence is reposed has entered into a relationship in which he or she acts to serve the interests of the party entrusting him or her with such information.'" *Sec. & Exch. Comm'n v. Alpert*, No. 17-CV-01879-LTS, 2018 WL 1156012, at *3 (S.D.N.Y. Mar. 2, 2018) (quoting *Falcone*, 257 F.3d at 234-35 (2d Cir. 2001)). The relationship between arm's length negotiators will not suffice. *See United States v. Cassese*, 273 F. Supp. 2d 481, 486 (S.D.N.Y. 2003). Instead, "[a] fiduciary relationship involves discretionary authority and dependency: One person depends on another—the fiduciary—to serve his interests." *Chestman*, 947 F.2d at 569. "Fiduciary-like dominance arises out of some combination of 1) disparate knowledge and expertise, 2) a persuasive need to share confidential information, and 3) a legal duty to render competent aid." *Cassese*, 273 F. Supp. 2d at 486 (quotations omitted).

Plaintiffs set forth several theories attaching a fiduciary duty to Defendants: (1) express agreements to do so, both oral and written; (2) its longstanding relationship with Archegos where

11

it had a "pattern" of keeping information confidential; and (3) the corporate policies of both Defendants which prevent employees from trading on MNPI.

The Court, however, need not decide whether Defendants owed a duty of confidentiality to Archegos. Even if Defendants' roles as counterparties created duties of confidentiality, Plaintiffs crucially have failed to allege a deceptive or manipulative device (i.e, a breach of their alleged duty) by which Defendants committed a fraud upon Archegos. "Deception through nondisclosure is central" to misappropriation theory. *O'Hagan*, 521 U.S. at 654; *S.E.C. v. Rorech*, 720 F. Supp. 2d 367, 416 (S.D.N.Y. 2010) ("Deception is [ ] an essential element of all claims brought pursuant to the misappropriation theory of section 10(b) and Rule 10b–5 liability."). A fraud is necessarily consummated when the fraudulent party, "without disclosure to his principal, . . . uses the information to purchase or sell securities." *Lyon*, 605 F. Supp. 2d at 548 (quoting *O'Hagan*, 521 U.S. at 656).[4] This differentiates misappropriation theory from classical theory of insider trading: "[b]ecause the misappropriation theory is based on a fiduciary duty to the source of the information, only disclosure to the source prevents deception; disclosure to other traders in the securities market cannot cure the fiduciary's breach of loyalty to his principal." *Obus*, 693 F.3d at 285.

The Complaint fails to adequately allege that Defendants breached any duty it may have had towards Archegos. First, Plaintiffs concede that much of the stock traded during the week of

---

[4] While courts have found misappropriation liability could be established absent the satisfaction of the nondisclosure standard from *O'Hagan*, they have done so in cases where it is plausibly alleged that Defendant employed some other deceptive device to improperly gain access to MNPI. *See, e.g., S.E.C. v. Dorozhko*, 574 F.3d 42, 49 (2d Cir. 2009) (finding deception where a computer hacker "affirmatively misrepresented himself in order to gain access to material, nonpublic information, which he then used to trade"); *S.E.C. v. Rocklage*, 470 F.3d 1, 8 (1st Cir. 2006) (finding deception where a wife "tricked her husband into revealing confidential information to her so that she could, and did, assist her brother with the sale of his [] stock"). No such allegations were made here.

the Archegos meltdown was TRS-related collateral.  It is undisputed, pursuant to the Complaint and the acknowledgment of the parties, that Defendants had the right to trade away the securities they held as collateral the moment Archegos defaulted on its obligations.  Compl. ¶¶ 173, 297; Defs.' MOL at 11, ECF No. 56; Pls.' Opp. at 13, ECF No. 59.  Archegos defaulted on its obligations on March 24, 2021, when it notified Defendants it would not meet its margin calls. Compl. ¶ 197.  Therefore, liability could only attach to the hedges Defendants obtained over the course of their relationships with Archegos because they were the only shares at issue that Defendants traded outside of that contractual right.

Second, and crucially, Plaintiffs do not point to a single trade executed by Defendants where they did not *disclose the trade to Archegos*.  Although the timeline as alleged in the Complaint is far from clear, the vast majority of relevant events take place from March 22–27, 2021, the alleged Class Period. To sift through the factual allegations even more finely, the Court focuses on March 25 and 26, the days of harried panic concerning the unwinding of Archegos-entangled stock.  Plaintiffs allege with the required particularity three instances of Defendants trading stock in relation to Archegos: (1) Goldman Sachs executed a block trade on Archegos' behalf on March 25; (2) Morgan Stanley "quietly" executed trades totaling $5 billion on March 25; and (3) both Defendants issued default notices on March 26, unwinding their swap positions with Archegos and sending stock prices plummeting.  Compl. ¶¶ 200–06.  Ultimately, these instances are the only trades associated with Defendants that are alleged with any particularity in the Complaint.[5] None of these evince a breach of a fiduciary duty to Archegos because, according

---

[5] The Court declines to credit Plaintiffs vague assertion that Defendants "may have" tipped off preferred hedge fund clients. Compl. ¶¶ 73, 257.  Plaintiffs point to no specific sales connected to these tips, nor the circumstances of the tips themselves. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 354 (S.D.N.Y. 2008) ("[P]laintiffs must plead the alleged [insider] trading scheme

to the Complaint, none of these trades were made in deception of a duty of confidentiality to Archegos.

With respect to Goldman Sachs' March 25 trade, the Complaint states that "[i]n an attempt to obtain enough liquidity to satisfy outstanding margin calls, after market close on March 25, 2021, *Archegos reached out to Defendant Goldman Sachs to execute a block trade.*" *Id.* ¶ 200 (emphasis added). With respect to Morgan Stanley allegedly "quietly unload[ing] some of its risky positions" with respect to Archegos on March 25, the Complaint states that "Morgan Stanley had the consent of Archegos . . . to shop around its stock late Thursday . . . ." *Id.* ¶ 204. Finally, with respect to Defendants' trades on March 26, 2021, the Complaint states that, prior to unwinding the Archegos swaps and hedges, "Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties issued default notices and/or exercised early termination rights." *Id.* ¶ 206. Given the clear factual allegations in the Complaint that Archegos was on notice of and indeed participated in the trading that occurred through its default, the Court is hard pressed to cobble together any theory that Defendants acted in deception of Archegos while trading. The Court fails to see how Archegos could be deceived when it was aware of and, in some instances facilitated, the relevant trades. *See Rorech*, 720 F. Supp. 2d at 416 (declining to attach misappropriation liability where there was no deception coupled with the trades).

Plaintiffs do not address the issue of Archegos's consent in their briefing on this motion. Instead, Plaintiffs allege that, because Defendants traded away the hedged securities they purchased to manage the risk of its swaps with Archegos, in addition to the pledged collateral, Defendants breached a duty of confidentiality solely by trading the hedged shares. In doing so

---

with particularity."). As a result, this allegation finds no particular plausible basis in the Complaint and stands separate and apart from the rest of the allegations.

Plaintiffs rely heavily on *Veleron Holding, B.V. v. Morgan Stanley*, in which the Honorable Colleen McMahon denied a defendant (Morgan Stanley) summary judgment on an insider trading claim concerning a swap agreement. 117 F. Supp. 3d 404, 413 (S.D.N.Y. 2015). *Veleron*, however, is highly distinguishable from this case.

The Court agrees with Judge McMahon that brokers do not, as a matter of law, have an unequivocal right to place or sell their hedges on MNPI, even in the event they had the right to sell collateral. *Cf. id.* at 455. But the facts of *Veleron* are distinguishable from those alleged here; in *Veleron*, Morgan Stanley, acting as an agent for another loaning entity (BNP Paribas), was on notice of the plaintiff's failure to meet a margin call and began take short positions in the stock at issues as hedges to an undeclared default. *Id.* at 420–22. These purchases occurred *while* Morgan Stanley was a party to negotiations regarding the restructuring of the loan between BNP and Veleron. *Id.* Judge McMahon, in finding a genuine dispute of material fact as to the breach of a fiduciary relationship, noted that the "key aspect of this particular undertaking was entirely within BNP's control. Morgan Stanley could only sell the stock *after BNP declared the loan to be in default, gave Veleron the requisite notices*, and affirmatively directed Morgan Stanley to dispose of the collateral." *Id.* at 454 (emphasis added). Judge McMahon also focused heavily on the fact that Morgan Stanley wore "two hats" as both a disposal agent and a hedging bank. *Id.* at 455.

Here, the Complaint articulates only that Defendants only acted either pursuant to (1) Archegos's consent or (2) issuing notice of default. Compl. ¶¶ 200–06 (detailing several trades and phones call in which Defendants traded with notice to Archegos). Defendants were solely acting in their capacities as Counterparties to TRSs. When Defendants issued default notices on March 26, Archegos was assuredly on notice that they intended to trade on the MNPI. Thus, Plaintiffs cannot sustain an insider trading claim based on a theory of misappropriation.

## IV.   Tipper/Tippee Liability

In addition to alleging insider trading under a misappropriation theory, Plaintiffs also allege that Defendants breached a duty to the shareholders of the Issuers themselves, characterizing Archegos as a tipper and Defendants as tippees.   Plaintiffs pursue this theory under both a traditional theory of insider trading liability and a misappropriation theory of insider trading.

To establish tipper/tippee insider trading liability, a Plaintiff must allege

(1) the corporate insider [or misappropriator] was entrusted with a fiduciary duty; (2) the corporate insider [or misappropriator] breached his fiduciary duty by (a) disclosing confidential information to a tippee (b) in exchange for a personal benefit; (3) the tippee knew of the tipper's breach, that is, he knew the information was confidential and divulged for personal benefit; and (4) the tippee still used that information to trade in a security or tip another individual for personal benefit.

*Veleron*, 117 F. Supp. 3d at 456.

Plaintiffs allege that Archegos was an insider through its status as a beneficial owner of the Issuers' stocks.   Therefore, its disclosure of MNPI to Defendants constituted a breach of a general fiduciary duty to Plaintiffs.   In the alternative, Plaintiffs argue that Archegos misappropriated MNPI from the Issuers, and then tipped Defendants with that information.

It is difficult to discern whether or not Archegos was an insider for the purposes of insider trading law.   Generally, insiders are those who would have a general fiduciary duty to the issuers. Directors, officers, and controlling shareholders are easily characterized as insiders in an insider trading analysis. *See Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014).   Noncontrolling shareholders, on the other hand, are generally not.[6] *See Sawant v. Ramsey*, 742 F. Supp. 2d 219,

---

[6] Based partially on this, The Court disagrees with Plaintiffs on the meaning of *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 177 (2d Cir. 2012). *Donoghue* stands for the proposition that beneficial owners who own more than 10% of stock are "insiders" under § 16(b) of the Securities Exchange Act, rendering it unlawful to engage in short swing trading. *Id.* at 177–78. Surely, with respect to § 16(b), the court found a statutory right. *Id.* That does not, in and of itself,

238 (D. Conn. 2010).  However, whether a shareholder is an insider is circumstantial, and can depend on the specific facts of a situation.  *See, e.g.*, *Gruber v. Gilbertson*, No. 16-CV-9727, 2021 WL 2482109, at *14 (S.D.N.Y. June 17, 2021).  Here, in March 2021, Archegos was the beneficial owner of the majority or a substantial portion of each Issuers' outstanding shares, through its TRSs where it had a partial ownership interest.  *See* 17 C.F.R. § 240.13d-3(a) ("[A] beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares . . . [i]nvestment power which includes the power to dispose, or to direct the disposition of, such security.").

Further, Archegos had massive control over the price of the stocks themselves because the prices were artificially inflated as a direct result of Archegos's market manipulation scheme. *Id.* ¶ 9.  And the Complaint alleges several instances where the prices were specifically altered solely through the actions of Archegos.  *See, e.g.*, *id.* ¶¶ 279–80. This level of control placed Archegos in possession of MNPI regarding the Issuers' stocks, and therefore raises the allegation of Archegos's insider status to "plausible."  *See Gruber*, 2021 WL 2482109, at *14 (finding the defendants were insiders in part because they "engaged in a stock manipulation scheme to pump up [the issuer's] stock in order to trigger the APP which resulted in a payout to themselves").

However, Plaintiffs tipper/tippee theory fails on deficient factual allegations.  Plaintiffs do not even attempt to allege that Archegos shared this information to seek a personal benefit, foreclosing liability under a tipper/tippee theory insider trading.  *State Teachers Ret. Bd. v. Fluor Corp.*, 592 F. Supp. 592, 594 (S.D.N.Y.1984) ("The second prerequisite to tippee liability-tippee knowledge of tipper breach—necessitates tippee knowledge of each element, including the

---

establish Archegos had a more general duty of confidentiality.  *See Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014) (quotations omitted).

personal benefit, of the tipper's breach.")[7]; *see also See United States v. Martoma*, 894 F.3d 64,

68 (2d Cir. 2017). Plaintiffs do not even allege that Archegos *expected* Defendants to trade on the

information. *See Salman*, 580 U.S. 39, 137 S. Ct. at 424; *United States v. Klein*, 913 F.3d 73, 80

(2d Cir. 2019). In fact, they allege the exact opposite: that Archegos expected Defendants to

*refrain* from trading, opt for a managed liquidation, and that the trades ultimately harmed

Archegos. *See* Compl. ¶ 284 ("Defendants Morgan Stanley and Goldman Sachs knew or

reasonably should have known or that Archegos did and would expect that Defendants Morgan

Stanley and Goldman Sachs would maintain the confidentiality of the MNPI obtained from

Archegos as alleged herein."). Thus, the Complaint fails to articulate tipper/tippee liability.

Given that dismissal on tipper tippee liability rests on the deficiency of the pleadings, the

Court dismisses without prejudice and with leave to amend. *See* Fed. R. Civ. P. 15(a) (noting that

leave to amend should be freely given).

## V.   **Sections 20A and 20(a)**

Finally, Plaintiffs bring claims under both Section 20A and 20(a) of the Exchange Act. Section

20A of the Exchange Act provides

> Any person who violates any provision of this chapter or the rules or regulations
> thereunder by purchasing or selling a security while in possession of material,
> nonpublic information shall be liable in an action in any court of competent
> jurisdiction to any person who, contemporaneously with the purchase or sale of

---

[7] Although the Court does not address the scienter element of the Rule 10(b) liability, it notes that this aspect of the pleadings directly implicates Defendants' intent, and therefore could implicate the PSLRA's scienter element. *See S.E.C. v. Yun*, 327 F.3d 1263, 1277 n.29 (11th Cir. 2003) (quoting Donald C. Langevoort, *Insider Trading Regulation, Enforcement, and Prevention* § 4:3 n. 7 (2002)) (finding the personal benefit element "merges a discussion of the necessary state of mind for tippee liability (a scienter concept) with a discussion of the nature of the breach necessary to create tipper liability"); *United States v. Martoma*, 894 F.3d 64, 76 (2d Cir. 2017) (invoking scienter in discussing the personal benefit requirement). The Court need not decide in this opinion whether the heightened pleading standard applies, but notes that, given the importance of intent in pleading securities fraud, Plaintiffs were required to make *some* allegation on this point.

securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t-1(a). To allege a Section 20A violation, a plaintiff must "(1) plead a predicate insider trading violation of the Exchange Act, and (2) allege sufficient facts showing that the defendant traded the security at issue contemporaneously with the plaintiff." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008) (cleaned up). Because Plaintiffs fail to state claims under Section 10(b) and Rule 10b-5, they also fail to state claims under Sections 20A and 20(a) of the Exchange Act. *See Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 (2d Cir. 2022) (holding claims under Sections 20A and 20(a) of the Exchange Act fail if there is no primary violation). Nevertheless, because the Court dismisses Plaintiffs' claims without prejudice, it addresses Defendants' supplemental arguments.

With respect to the Section 20A claim, Defendants allege that the Lead Plaintiffs in *Felix v. Goldman Sachs*, 21-cv-10286 (S.D.N.Y. filed Dec. 2, 2021), and *Scully v. Goldman Sachs*, 21-cv-10791 (S.D.N.Y. filed Dec. 16, 2021), failed to allege they traded "contemporaneously" with Defendants because they only purchased shares before the alleged insider trading.[8] The Court is persuaded by this argument.

In both *Felix* and *Scully*, Lead Plaintiffs allege they traded stocks in the Issuers on March 24, 2021.[9] As discussed *supra*, the Complaint only alleges that Defendants began trading on MNPI on March 25, 2021. While "the liability of one who trades on inside information may extend to

_____

[8] Specifically, this pertains to Plaintiff Jeffrey Wachtell in *Scully* and Plaintiff Yan Cai Jiang in *Felix*. Am. Compl. ¶ 22, ECF 40 & PSLRA Cert., ECF 26-2, *Felix*, No. 1:21-cv-10286; Am. Compl. ¶ 22, ECF 39 & PSLRA Cert., ECF 25-2, 25-4, *Scully*, No. 1:21-cv-10791.

[9] Specifically, this pertains to Plaintiff Jeffrey Wachtell in *Scully* and Plaintiff Yan Cai Jiang in *Felix*. Am. Compl. ¶ 22, ECF 40 & PSLRA Cert., ECF 26-2, *Felix*, No. 1:21-cv-10286; Am. Compl. ¶ 22, ECF 39 & PSLRA Cert., ECF 25-2, 25-4, *Scully*, No. 1:21-cv-10791.

all those who trade between the date of the defendant's sales and the date of public disclosure of the inside information, liability does not extend to those who traded prior to the defendant's breach of his duty to 'disclose or abstain'—that is, prior to the date of the defendant's trades." *O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*, 559 F. Supp. 800, 803 (S.D.N.Y. 1983) (citations omitted); *see also Take-Two*, 551 F. Supp. 2d at 311 n. 51 ("These defendants . . . may not be held liable for purchases Lead Plaintiffs carried out before the alleged insider trading in question."). Because trades cannot be "contemporaneous" if they occur before the trades on MNPI, the *Felix* and *Scully* Plaintiffs fail to allege Section 20A claims.

Finally, the Court addresses Plaintiffs' claims under Section 20(a). "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b–2). For an individual to incur Section 20(a) liability, he "must not only have control over the primary violator, but have control over the transaction in question." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166 (S.D.N.Y. 2012).

While Plaintiffs are correct that this is a low standard, the Complaint fails to adequately meet that standard. Unquestionably, to establish a "prima facie case of controlling-person liability, a plaintiff must show a primary violation *by the controlled person* and control of the *primary violator*

20

by the targeted defendant." *First Jersey*, 101 F.3d at 1472 (emphasis added). Plaintiffs do not allege any specific employee of Defendants traded on MNPI. Rather, they broadly assert that Morgan Stanley and Goldman Sachs as *entities* conducted these schemes. Nor do they connect their accusations in any meaningful way to the employees they *do* name in the Complaint. Compl. ¶¶ 74, 243 (noting that Morgan Stanley placed Pawan Passi on leave in connection with the Archegos debacle, and that DOJ sought communications from Evan Damast, John Paci, and Charlies Leisure); and ¶¶ 10, 75 (noting that Michael Daum from Goldman Sachs and Michael Lewis formerly of Morgan Stanley may have been involved in the Archegos debacle). Thus, these claims fail, although the Court will dismiss without prejudice as, once again, dismissal is premised on pleading deficiencies.

## CONCLUSION

Defendants' motion to dismiss is **GRANTED.** This dismissal without prejudice as leave to amend should be freely given. Fed. R. Civ. P. 15(a). Plaintiffs have 30 days in which to file Second Amended Complaints consistent with this order. The Clerk of Court is respectfully directed to close the motion at ECF Number 55.[10]


Dated: New York, New York            SO ORDERED
       March 3, 2023

                                     _____
                                     HONORABLE PAUL A. CROTTY
                                     United States District Judge


---

[10] The Clerk of the Court is likewise directed to close the motions in in the following related cases: ECF No. 53 in 1:21-cv-08618-PAC; ECF No. 57 in 1:21-cv-08752-PAC; ECF No. 53 in 1:21-cv-08897-PAC; ECF No. 45 in 1:21-cv-10286-PAC; ECF No. 40 in 1:21-cv-10791-PAC; and ECF No. 44 in 1:22-cv-00169-PAC.